**UNITED STATES of America,**
**Appellee,**

v.

**Robert BRADWELL, Appellant.**

**No. 230, Docket 30762.**

United States Court of Appeals
Second Circuit.

Argued Jan. 3, 1968.

Decided Jan. 19, 1968.

Gerald F. Stevens, Milford, Conn., for appellant.

Samuel J. Heyman, Asst. U. S. Atty. (Jon O. Newman, U. S. Atty., J. Daniel Sagarin, Asst. U. S. Atty., New Haven, Conn.), for appellee.

Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge:

Robert Bradwell, after being acquitted in the District Court for Connecticut of various violations of the Mann Act, 18 U.S.C. §§ 2421, 2423 and 371, because of lack of proof of interstate transportation, was indicted in the same court, and convicted after trial before Chief Judge Timbers and a jury, of having endeavored to obstruct the administration of justice in violation of 18 U.S.C. § 1503. His first indictment had resulted from a Bridgeport grand jury's investigation of interstate transportation, including prostitution, in aid of racketeering enterprises, begun in August 1965, in which Bradwell had been a prime suspect.

An FBI agent testified at the trial below that he had several interviews, near the end of November 1965, with James McElroy, a former employee of Bradwell, who provided "very pertinent information" about him; that, as a result, McElroy was called before the grand jury on December 7; that the agent instructed he might be recalled before the grand jury or at trial of the Mann Act charges; and that he was so recalled in March 1966. McElroy testified that while he was sitting at a Bridgeport snack counter on the evening of December 18, 1965, Bradwell and a woman entered, and the former said, "Some of you niggers are going to get killed if you don't stop talking to the Feds." Later Bradwell returned alone and told McElroy, "I know what you said—told the Grand Jury, every word to word." Against this, Bradwell testified he had been hunting with two friends on December 18, had returned home after 8 P.M. and did not leave his house that evening. One of the friends corroborated this up to 9 P.M., and another male acquaintance carried the confirmation up to 10 P.M.

Bradwell's first complaint, that the judge allowed the jury to learn that the grand jury investigation and the first indictment concerned his promotion of prostitution, requires little discussion. In order to show that a defendant has intimidated a witness in a grand jury investigation, it is appropriate for the

Government to establish a motive by connecting him with the objects of the investigation. See United States v. Knohl, 379 F.2d 427, 438–439 (2 Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed. 2d 465 (1967). Moreover, in order that the jury may assess the intensity of his motive, it should know the nature of the offense under investigation and the extent of the defendant's involvement; limiting the Government to a mysterious statement that the defendant was somehow connected with an investigation into some unidentified crime would unduly hamper its presentation. While allowing such proof in an obstruction case inevitably entails danger that the jury may convict the defendant for the crime previously investigated, this is a matter for cautionary instructions by the judge and here these were given in ample measure.

Bradwell's second point concerns the evidence of Jean Brice, another former employee. She testified, over proper objection, that in February 1965 FBI agents interviewed her in Baltimore concerning her work as a prostitute for Bradwell in Bridgeport and that, pursuant to subpoena, she gave evidence on that subject before the grand jury in August 1965 and at Bradwell's Mann Act trial in March 1966. She said also that a nephew of Bradwell came to see her in Baltimore a few weeks after her grand jury testimony; that they returned together to Bradwell's "house" in Bridgeport; and that Bradwell told her she was getting herself "into a lot of trouble by talking so much" to the FBI. The "trouble" allegedly would come from friends of another prospective defendant against whom she had also testified; Bradwell told Brice he knew how they operate and, in her descriptive words, "I could find myself in the East River one morning and nobody would ever know what had happened to me." Bradwell then dis-

cussed her grand jury testimony about him and said she "was definitely wrong in one particular phase of my testimony, that he had not picked me up at one particular time but had picked me up at another," and suggested that she straighten out this and another statement. Later Bradwell and the nephew escorted Brice to the office of a lawyer— not the attorney who has capably represented Bradwell in this case—and she dictated a statement along the lines he had suggested.[1]

■ Before admitting this testimony the court asked defense counsel if he was willing to have the case submitted to the jury on the simple issue of Bradwell's having made the statement to McElroy or would request a charge that the jury must also find the specific intent required by the statute. Counsel opted for the latter.[2] Near the beginning of Brice's testimony the judge instructed the jury that this was to be considered solely "on the issue of intent on the part of the defendant," and also that any references by her or other witnesses to Bradwell's promoting prostitution have "nothing whatsoever to do with this case." In a painstaking charge he directed that the jury must find, without any reference to Brice's evidence, that McElroy was a witness before the grand jury, that Bradwell knew this, and that Bradwell threatened him on or about December 18; only if they answered all these questions in the affirmative, could they consider Brice's evidence as bearing on Bradwell's "specific intent to influence, intimidate and impede" McElroy as a grand jury witness.

■ We cannot conceive how a judge could more carefully comply with the rule, applied by many courts, that evidence of other crimes is admissible only if it serves one of a series of purposes, classically formulated in People v. Moli-

1. The Government informs us that its failure to present the Brice episode to the grand jury that returned the instant indictment was due to its not having discovered the incident until shortly before trial.

2. There was therefore no occasion to require the Government to defer the offer until defendant had testified. See 2 Wigmore, Evidence § 307 (1940 ed.).

neux, 168 N.Y. 264, 61 N.E. 286 (1901), see McCormick, Evidence § 157 (1954). Defendant's true objection must be rather that the ritual so dutifully performed by the trial judge was exactly that; and we must indeed confess a degree of skepticism as to the reality of expecting all twelve jurors to perform a feat of first raising and then lowering a mental bulkhead altogether beyond our capacity. But the *Molineux* rule is not the rule of this circuit. Like several other federal courts of appeals, we hold rather that evidence of another crime may be admitted if it "is substantially relevant for some other purpose than to show a probability" that the defendant "committed the crime on trial because he is a man of criminal character," with admission to depend upon the trial judge's appropriately "balancing, on the one side, the actual need for the other-crimes-evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that the other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes-evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility." United States v. Bozza, 365 F.2d 206, 213–214 (2 Cir. 1966), quoting McCormick, Evidence § 157 at 327 and 332, and other authorities there cited; United States v. Deaton, 381 F.2d 114, 117–118 (2 Cir. 1967); United States v. Johnson, 382 F.2d 280 (2 Cir. 1967); United States v. Gardin, 382 F.2d 601, 603–604 (2 Cir. 1967).

■ The propriety of admitting Brice's testimony under this standard is apparent. This was not a case where the other-crimes-evidence was thrown on scales already heavily tipped against the defendant; the Government had real need to bolster McElroy's testimony against Bradwell's anticipated denial. Evidence that Bradwell had threatened another witness testifying to similar activity before the same grand jury was highly probative, not simply as showing a course of conduct, although that would have sufficed under the circumstances, but, with Brice's elaboration, as confirming that Bradwell did have means of knowing "every word to word" said to the grand jury as McElroy claimed he had asserted. Proof that a defendant has engaged in a second criminal act of the same sort for which he is being tried is not likely to rouse the jury to "overmastering hostility," see United States v. Bozza, supra, 365 F.2d at 214; that phrase refers to instances "where the minute peg of relevancy will be entirely obscured by the dirty linen hung upon .it." State v. Goebel, 36 Wash.2d 367, 379, 218 P.2d 300, 306 (1950).

■ Counsel asserts that, however all this may be, the jury got the impression that Bradwell was a man of bad character. Very likely it did. But what the law rules out is evidence of other crimes directed solely to establishing that. It does not demand exclusion of highly probative evidence simply to prevent noisome odors about the defendant from reaching the jury's nostrils.

Affirmed.